1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| CHRISTIN KAY BAER, | Case No.  1:15-cv-01358-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 15, 18) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

11

12

13

14

15

16

17

18

## I.

19

## INTRODUCTION

20
      Plaintiff Christin Kay Baer ("Plaintiff") seeks judicial review of a final decision of the

21 Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

22 disability benefits pursuant to the Social Security Act.  The matter is currently before the Court

23 on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley

24 A. Boone.[1]

25
      Plaintiff suffers from fibromyalgia, severe body pain, anxiety, poor concentration,

26 diabetes, manic episodes, chronic fatigue, insomnia, depression, right carpal tunnel syndrome,

27 and obesity.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

28

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos.7, 8.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits on September 6, 2011, alleging disability beginning on June 7, 2011.  (AR 196-97.)  Plaintiff's application was initially denied on March 23, 2012, and denied upon reconsideration on November 20, 2012.  (AR 69-141, 144-148.)   Plaintiff requested and received a hearing before Administrative Law Judge Serena Hong ("the ALJ").  Plaintiff appeared for a hearing on October 17, 2013.  (AR 36-68.)  On December 19, 2013, the ALJ found that Plaintiff was not disabled.  (AR 12-30.)  The Appeals Council denied Plaintiff's request for review on June 30, 2015. (AR 1-5.)

### A.      Hearing Testimony

Plaintiff testified at the October 17, 2013 hearing and was represented by counsel.  (AR 36-68.)  Plaintiff was born on December 26, 1968.  (AR 40.)  She lives with her husband and her mom.  (AR 40.)  She has a driver's license, drove to the hearing, and drives 3 to 4 times a week to Walmart, to pick up prescriptions, or to a doctor's office.  (AR 41, 55.) She is 5'9" and about 340 lbs.  (AR 41.)  She lost about 60 to 70 lbs by dieting, having less stress, and a medication, Metformin.  (AR 41.)  She completed some college and a trade school to be a medical assistant. (AR 42.)

Plaintiff last worked on June 7, 2011, when she worked for American Ambulance doing medical billing, patient intake, and filing  individual files.  (AR 42-43.)   She stopped working there after she had a breakdown and became very depressed and was diagnosed with fibromyalgia and being bipolar.  (AR 43.)  Prior to her breakdown, she was on stress leave and then leave for an injury to her arm.  (AR 43.)

Prior to American Ambulance, Plaintiff worked for St. Agnes Medical Center for the childcare center.  (AR 43.)  She did data entry, answered phones, took care of infants, took care of the school-aged children, including driving them to school and after school care in a 12-person commercial van, ran errands, and picked up supplies at stores.  (AR 44.)

Plaintiff cannot work because of complete exhaustion.  (AR 44.)  She does not sleep for

more than 1 to 3 hours a night and she has pain 24/7.  (AR 45.) She cannot be around people without having anxiety and she cannot be around a lot of noise.  (AR 45.)   She cannot concentrate, sit or stand for more than 15 or 20 minutes, or get comfortable in any position to sleep.  (AR 45.)

Plaintiff sees Dr. Christina Weaver, her general practitioner, approximately once a month.  (AR 45.)  Dr. Weaver manages Plaintiff's medications, including the ones for diabetes and fibromyalgia.   (AR 45.)   Dr. Weaver has not provided any other treatment besides medication.  (AR 45-46.)  Dr. Weaver did not prescribe the cane that Plaintiff uses.  (AR 46.)

Plaintiff also sees Dr. Alissa Salazar, a nurse practitioner for psychiatry, once every six weeks or as needed.  (AR 46.)  Dr. Salazar manages Plaintiff's bipolar medication and does like a "mini-therapy."  (AR 46.)  Plaintiff does not do any other treatment for her mental health.  (AR 46.)   She does not attend group therapy sessions because she is usually really tired in the morning at the times of the sessions and they are across town and she cannot drive by herself. (AR 46-47.)

Plaintiff sees a cardiologist twice a year for medication.  (AR 47.)  The cardiologist did a cardioversion a couple of years ago.  (AR 47.)

Plaintiff takes Metformin for her diabetes, a vitamin D supplement, Depakote for her bipolar, norco and oxycodone for pain, and Triamterene and Atopolol for afib and high blood pressure.  (AR 47.)  The Depakote helps Plaintiff with her bipolar and moods, but it makes her sleepy.  (AR 47-48.)  She thinks that the oxycodone and norco help somewhat, but they have acclimated to her body.  (AR 47.)  The Atopolol makes her sleepy and sometimes dizzy, so she lays down.  (AR 48.)

During a typical day, Plaintiff goes to the couch where there are pillows set up to prop her up, watches TV, eats something that is already prepared, watches TV and takes a nap, eats lunch that her husband prepares, and watches TV or goes outside.  (AR 48.)  She goes to bed about 7:00 or 7:30 p.m. every night.  (AR 49.)  She goes to Walmart a couple of times a week when she feels up to it at about 7:00 a.m. for approximately 15 to 20 minutes with her mother. (AR 48, 54.)  She walks around the store as much as she can for exercise.  (AR 54.)  When she

1   returns home from Walmart, she sits outside and then goes inside.  (AR 48.)  She likes to watch

2   the Food Network, but she usually watches what her husband is watching, NCIS and Law and

3   Order.  (AR 49.)  She can follow along with the TV shows, but sometimes she does not pay

4   attention, falls asleep, or looks at her iPhone because she gets distracted.  (AR 49.)  She does not

5   play any games on her iPhone, but she interacts with friends on Facebook.  (AR 49.)

6       Plaintiff stopped drinking alcohol three years before the hearing.  (AR 50.)  She feels like

7   her symptoms have gotten worse since she stopped drinking alcohol, because she did not have

8   the fibromyalgia and the pain when she was drinking.  (AR 50.)  Plaintiff uses a cane because her

9   conditions affect her ability to stand and walk.  (AR 50.)  She could stand and walk a total of 1

10  hour during an 8-hour workday.  (AR 50.)  She could sit for approximately 30-45 minutes before

11  having to change positions.  (AR 50-51.)  She could lift five pounds in each hand for a total of

12  ten pounds using both hands.  (AR 51.)  She has some numbness in her left arm going into her

13  hand and fingers which she thinks may be from a pinched nerve.  (AR 51.)  She has problems

14  with her right elbow that keep her from lifting without pain, cooking, and stirring.  (AR 52.)

15      Regarding her mental impairments, she has trouble remembering things sometimes, such

16  as what she had for breakfast.  (AR 52.)  When she is trying to communicate, she cannot think of

17  words, and sometimes she cannot articulate correctly which causes her to get frustrated and

18  angry.  (AR 52.)  When she gets frustrated or angry, her fibromyalgia is worse because of the

19  stress and she ends up crying.  (AR 52.)  She cries a lot and cannot control it.  (AR 52.)  She does

20  not deal well with stress or other people.  (AR 53.)  She is working with her psychiatrist on her

21  issues with lashing out at people.  (AR 53.)  She has a hard time being around people she does

22  not know and big groups.  (AR 54.)  She could possibly follow a set of directions and she is able

23  to concentrate to complete a task.  (AR 53-54.)

24      Plaintiff's mother helps her get dressed and sits in the bathroom when she takes a shower

25  because she gets dizzy.  (AR 55.)  She gets her hair washed at the salon because she cannot wash

26  it herself due to her arms going numb when she lifts her hands above her head.  (AR 55.)  Her

27  husband puts "her socks and stuff on at night" and her CPAP machine.  (AR 55.)  She does not

28  do any of the household chores and does not have any hobbies besides TV and Facebook.  (AR

56.)  She used to cook, bake, go swimming, go fishing, and visit friends.  (AR 56.)  She started using a cane because she was falling and losing her balance.  (AR 56.)  She stays in her room all day approximately two days a week.  (AR 56.)  She lays down four to five hours a day.  (AR 56.)  She does not do any exercising or stretching besides walking.  (AR 56.)

Vocational Expert ("VE") Cheryl Chandler testified at the hearing.  (AR 57-67.)  The VE identified Plaintiff's past work regarding the medical billing job as a medical records technician, DOT 079.262-014, sedentary, semi-skilled, and SVP 4, and as a billing clerk, DOT 214.382-014, sedentary, and SVP 4.  (AR 58.)  For Plaintiff's childcare job, the VE testified that she was a child monitor, DOT 301.677-010, medium, semi-skilled, and SVP 3, and a driver, DOT 913.663-018, medium, and SVP 3.  (AR 58-59.)

The first hypothetical that the ALJ gave the VE was for an individual of Plaintiff's age, education, and past work experience, who is limited to performing work at the light exertional level, but cannot climb ladders, ropes, and scaffolds, can frequently handle with the right upper extremity, limited to performing simple, routine tasks, and must avoid concentrated exposure to hazards such as unprotected heights and moving machinery.  (AR 59.)  The VE testified that the individual could not perform Plaintiff's past relevant work because of the simple, routine limitation.  (AR 59.)  However, this individual could perform light, unskilled work such as (1) an usher in a theater, DOT 344.677-014, light, and SVP 2; (2) a cashier, DOT 211.462-010, light, unskilled, and SVP 2; and (3) an information clerk, DOT 237.367-018, light, unskilled, and SVP 2.  (AR 59.)

The second hypothetical that the ALJ gave the VE was for the same individual as the first hypothetical, except this individual is limited to performing work at the sedentary level.  (AR 60.)  The VE found that this individual could not perform Plaintiff's past relevant work, but could perform the "world of unskilled, sedentary" jobs.  (AR 60.)

The third hypothetical that the ALJ gave the VE was for the same individual as the second hypothetical, except this individual is limited to standing and walking for one hour during an 8-hour workday, would need a cane to ambulate, and is limited to only occasional public contact.  (AR 60.)  The VE testified that the individual could perform work as: (1) a packing job

1   of hand bander, DOT 920.687-030, sedentary, unskilled, and SVP 2; (2) an assembler, DOT

2   734.687-018, sedentary, unskilled, and SVP 2; and (3) a nut sorter, DOT 921.687-086, sedentary,

3   unskilled, and SVP 2.  (AR 60-61.)

4          The fourth hypothetical that the ALJ gave the VE was for the same individual as the third

5   hypothetical, except the individual would require frequent, unscheduled breaks resulting in being

6   off task about 25 percent of the time.  (AR 61.)  The VE testified that there would be no jobs that

7   this individual could perform.  (AR 61.)

8          Plaintiff's counsel then asked the VE a hypothetical, which was referred to as the fifth

9   hypothetical, for the same individual as the third hypothetical, except the individual had to avoid

10  repetitive grasping or twerking with the right hand and keyboarding or writing in excess of 15

11  minutes per half hour.  (AR 61.)  The VE testified that there would be no jobs that this individual

12  could perform.  (AR 61.)  The ALJ clarified the difference between repetitive grasping or

13  twerking with the right hand in the fifth hypothetical and frequently handle with the upper right

14  extremity in the third hypothetical.  (AR 63-67.)  The VE testified that the terms frequent and

15  repetitive are not the same, since frequent is up to two-thirds of the day and repetitive is doing

16  something over and over again without the halts, breaks, or change of activity that a frequent

17  classification would have.  (AR 64.)  The VE testified that increasing the individual's limitations

18  from frequent to repetitive handling and adding a limitation for fine dexterity function are what

19  causes the individual in the fifth hypothetical to be unable to perform any jobs compared to the

20  individual in the third hypothetical.  (AR 65-66.)

21         Plaintiff's counsel then asked the VE another hypothetical, which was referred to as the

22  sixth hypothetical, for an individual who would need a stable work environment with minimal to

23  moderate variation in workload and that keeps interpersonal conflicts to a minimum, work not

24  requiring more than minimal mental activities, an adaptable work schedule which allows rest

25  periods depending on pain and fatigue, and to avoid heavy lifting more than 10 lbs, climbing,

26  and stooping.  (AR 61-62.)  The VE testified that the comments about rest periods were too

27  vague to respond to them.  (AR 62.)  Plaintiff's counsel clarified that the individual would

28  require more than the required breaks need in a workday so that the individual could take rest

1  periods whenever the individual felt it was necessary.  (AR 62.)  The VE responded that that

2  would be outside of the course of normal work activities and not tolerated on a consistent basis.

3  (AR 62.)

4  **B.** **ALJ Findings**

5  The ALJ made the following findings of fact and conclusions of law:

6  • Plaintiff meets the insured status requirements of the Social Security Act through

7  December 31, 2015;

8  • Plaintiff has not engaged in substantial gainful activity since June 7, 2011, the

9  alleged onset date;

10  • Plaintiff has the following severe impairments: fibromyalgia; obstructive sleep

11  apnea; diabetes mellitus; right carpal tunnel syndrome; obesity; major depressive

12  disorder; anxiety; and a history of alcohol abuse;

13  • Plaintiff does not have an impairment or combination of impairments that meets

14  or medically equals the severity of one of the listed impairments;

15  • Plaintiff has the residual functional capacity to perform light work as defined in

16  20 CFR 404.1567(b) except that she is limited to no climbing ladders, ropes, or

17  scaffolds; frequent handling with right upper extremity; avoidance of

18  concentrated exposure to hazards; and simple routine tasks;

19  • Plaintiff is unable to perform any past relevant work;

20  • Plaintiff was born on December 26, 1968, and was 42 years old, which is defined

21  as a younger individual age 18-49, on the alleged disability onset date;

22  • Plaintiff has at least a high school education and is able to communicate in

23  English;

24  • Transferability of job skills is not material to the determination of disability

25  because using the Medical-Vocational Rules as a framework supports a finding

26  that Plaintiff is "not disabled," whether or not Plaintiff has transferrable job skills;

27  • Considering Plaintiff's age, education, work experience, and residual functional

28  capacity, there are jobs that exist in significant numbers in the national economy

7

1     that Plaintiff can perform; and

2     •     Plaintiff has not been under a disability, as defined in the Social Security Act,

3           from June 7, 2011, through the date of the ALJ's decision.

4   (AR 12-30.)

5                                           **III.**

6                                   **LEGAL STANDARD**

7          An individual may obtain judicial review of any final decision of the Commissioner of

8   Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  The Court "reviews the

9   Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

10  disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

11  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a

12  scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

13  (internal quotations and citations omitted).  "Substantial evidence is 'such relevant evidence as a

14  reasonable mind might accept as adequate to support a conclusion.' "  Id. (quoting Richardson v.

15  Perales, 402 U.S. 389, 401 (1971)).  "[A] reviewing court must consider the entire record as a

16  whole and may not affirm simply by isolating a specific quantum of supporting evidence."  Hill,

17  698 F.3d at 1159 (quoting Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).

18  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the

19  Court's judgment for the ALJ's.   See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

20  ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

21  conclusion that must be upheld.")

22                                          **IV.**

23                            **DISCUSSION AND ANALYSIS**

24         Plaintiff challenges the non-disability finding on two grounds.  First, Plaintiff argues that

25  the ALJ erred in discrediting her subjective pain testimony.  Second, Plaintiff argues that the

26  ALJ erred in discrediting her lay witness, Shirleen Lord's testimony.  Defendant counters that the

27  ALJ provided specific, well-supported, and legally sufficient reasons for discrediting Plaintiff's

28  subjective pain testimony and germane reasons for discrediting Ms. Lord's testimony.

## A.    The ALJ Did Not Err in Discrediting Plaintiff's Testimony

Plaintiff contends that the ALJ improperly rejected her subjective pain testimony because the reasons that the ALJ gave are not clear and convincing reasons to reject her subjective pain testimony.   Defendant counters that benefits cannot be awarded based simply on Plaintiff's subjective complaints and the ALJ provided a valid basis that is supported by substantial evidence to reject Plaintiff's testimony.   Defendant argues that the ALJ discredited Plaintiff because her subjective complaints do not match the objective findings and the medical opinions, her activities of daily living do not support her complaints, and her treatment history does not support her complaints.[2]   (AR 17-28.)

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).   Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).   The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).   This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).   The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir.

---

[2] It appears that the ALJ may also have taken into account Plaintiff's motivations for her allegations.   (AR 17, 21.)

2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors. Lingenfelter, 504 F.3d at 1040; Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

1.   The ALJ Properly Discredited Plaintiff Based on Her Complaints Not Matching the Objective Findings

Plaintiff argues that the ALJ has an apparent misunderstanding of the nature of fibromyalgia, because it cannot be objectively proved, and therefore her complaints should not have been discredited just because they did not match the objective findings.  Defendant counters that an ALJ can discredit a plaintiff's allegations of disabling pain based on objective medical evidence, including for fibromyalgia-related allegations.  The ALJ found that Plaintiff's complaints do not match the objective findings and Plaintiff's credibility is weakened by the inconsistencies between her allegations and the medical evidence.  (AR 17-18.)

The Court recognizes that fibromyalgia is "diagnosed entirely on the basis of patients' reports of pain and other symptoms" and common symptoms include "chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004).  The ALJ herself acknowledged that there are tender points noted in some of the objective findings.  (AR 19, 22.)

However, the ALJ not only referenced inconsistencies regarding Plaintiff's physical

1    fibromyalgia symptoms and the objective evidence, but also discussed inconsistencies between

2    the medical evidence and Plaintiff's allegations regarding her mental impairments.  (AR 21, 23-

3    24.)  Plaintiff started seeing a psychiatric provider in September 2012 and at an evaluation that

4    month she claimed to have an onset of hallucinations.  (AR 483-87.)  She did have a depressed

5    mood and sobbing effect.  (AR 483-87.)  She reported in October 2012 that her depression was

6    better, but she could not go out of the house.  (AR 578.)  The ALJ found that "[Plaintiff's]

7    symptoms are not entirely credible, as will be explained in detail at a psychiatric evaluation

8    noted below."  (AR 21.)

9        The ALJ noted that Plaintiff had almost entirely benign mental status examination

10    findings during her two consultative psychological evaluations by Dr. James Murphy in January

11    2012 and by Dr. Steven Swanson in October 2012.  (AR 23-24, 437-40, 550-54.)  Plaintiff did

12    not have any symptoms of anxiety or depression and she relaxed and smiled after some initial

13    crying during her evaluation with Dr. Murphy.  (AR 437-40.)  She denied hallucinations, had

14    normal attention, intact short term and remote recall memory, a cooperative and friendly attitude,

15    clear and coherent thoughts, and she could handle ideas well.  (AR 438.)  During her evaluation

16    with Dr. Swanson, Plaintiff was friendly and cooperative and had a full range of affect, euthymic

17    mood until she talked about her former supervisor, normal short-term, recent, and remote

18    memories, intact judgment and insight, satisfactory concentration, and no indication of psychosis

19    or dangerous ideation.  (AR 552-53.)  Dr. Swanson found that difficulties in maintaining social

20    relationships do not appear to be present.  (AR 554.)

21        Therefore, the medical evidence is inconsistent with Plaintiff's allegations regarding her

22    mental impairments.  The Court finds that the ALJ did not err by discounting Plaintiff's

23    credibility because of inconsistencies between Plaintiff's allegations and the medical record.

24        2.    <u>The ALJ Properly Discounted Plaintiff's Testimony Based on Inconsistencies</u>
              <u>Between Plaintiff's Allegations and Her Statements Regarding Her Activities of</u>

25               <u>Daily Living</u>

26        Plaintiff argues that there is no basis for the ALJ's conclusion that Plaintiff participated in

27    more outside daily activities and had significantly greater social interaction than alleged.  She

28    contends that her hearing testimony and function reports are not contrary to the statements cited

1   by the ALJ.  Defendant counters that the ALJ properly found that Plaintiff's ability to engage in

2   her activities of daily living undercut her allegations of disabling functional limitations.

3       Plaintiff also argues that the ALJ failed to make specific findings relating to whether

4   Plaintiff's activities could transfer to the workplace and spend a substantial part of her day

5   performing them.  Defendant responds that controlling Ninth Circuit precedent establishes that

6   daily activities, even if they suggest some difficulty in functioning, are grounds for rejecting a

7   claimant's allegations.

8       The ALJ found:

9       There are statements in the record indicating that [Plaintiff] engages in more
        activities of daily living than alleged.   At the consultative psychological
10      examination in October of 2012, [Plaintiff] reported that she was independently
        able to complete all activities of daily living, including driving.  (Ex. 17F/5)  At
11      the consultative physical examination in February of 2012, [Plaintiff] reported
        that she shopped, walked for exercise, and performed her own activities of daily
12      living without assistance.  (Ex. 10F/4)  [Plaintiff] reported that she has "a lot of
        people on Facebook that are friends…"  She indicated that she otherwise has 3
13      friends and sees them twice a month to go to lunch, go to the park, or go over to
        the house.  She talks to her friends on the phone usually every day.  (Ex. 26F/82)
14      She reportedly talks to her brother a couple of times per week.  (Ex 26F/7)  She
        has a good relationship with her husband.  (Ex. 26F/9)  In a Deposition from
15      September of 2012, [Plaintiff] posted to a website about going to Cayucos, and
        she did visit there for several days.  (Ex. 26F/85)  In February of 2013, [Plaintiff]
16      noted that her mother was staying for a 1-month visit and she went to Oakland for
        a trip, went to the grocery store, and went to the park.  (Ex. 26F/6)  This is despite
17      her claim of spending no time with others.  (Ex. 10E/10)  As noted above,
        [Plaintiff] did report that she made and sold fig jam.  [Plaintiff] did at least
18      indicate in her Function Report that she prepares easy meals; got outside daily;
        drive; went shopping in stores, by mail, and by computer; and handle finances.
19      (Ex. 10E)

20  (AR 25.)

21      There are two ways for an ALJ to use daily activities to form the basis of an adverse

22  credibility determination: if the plaintiff's activities contradict her other testimony or if the

23  activities meet the threshold for transferable work skills.  Orn, 495 F.3d at 639.  In particular, an

24  ALJ may consider inconsistencies between a claimant's activities and her subjective complaints.

25  See Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 693 (9th Cir. 2009) (ALJ properly

26  determined that the claimant's daily activities "did not suggest [the claimant] could return to his

27  old job, but . . . did suggest that [plaintiff's] later claims about the severity of his limitations were

28  exaggerated"); Molina, 674 F.3d at 1112 (the ALJ may consider "whether the claimant engages

1    in daily activities inconsistent with the alleged symptoms") (internal citation omitted).

2         Here, the ALJ considered that Plaintiff's daily activities contradict her claims regarding

3    the severity of her symptoms.  While Plaintiff contends that the fact that she could go on a

4    limited trip in two different years over a year apart does not constitute evidence to undermine her

5    credibility, the ALJ cited multiple statements in the record which indicate that Plaintiff engages

6    in more activities than a claimed limitation.  (AR 25.)  Plaintiff alleged in her September 18,

7    2012 function report that her ability to work was limited because she has severe anxiety being

8    around other people.  (AR 279.)  However, as the ALJ acknowledged, Plaintiff also indicated

9    that she went shopping in stores, though she did indicate that the length of time depends on her

10   pain and anxiety.  (AR 25, 282.)

11        At her February 2012 consultative physical examination with Dr. Roger Wagner, Plaintiff

12   reported that she shops, performs her own activities of daily living without assistance, and walks

13   for exercise.  (AR 445.)  During her February 2013 psychiatric qualified medical examination as

14   part of her worker's compensation claim with Dr. Robindra, Plaintiff reported that she has "a lot

15   of people on Facebook that are friends…" and that otherwise she has three friends.  (AR 766.)

16   She sees her friends once or twice a month.  (Id.)  She indicated that "[her] one friend and [her]

17   go to lunch depending on what [she] feels.  Every once in a while [they] will go to the park to

18   feed the ducks.  [They] will go to their house to visit."  (Id.)  Additionally, she talks to her

19   friends one the phone "quite often…usually every day."  (Id.)  Plaintiff also said that she talks to

20   her younger brother "a couple of times a week" and she has a good relationship with her

21   husband.  (AR 691, 693.)

22        Dr. Robindra noted that Plaintiff stated during her September 6, 2012 deposition that she

23   had posted about going to Cayucos and she went there on or about May 14, 2012 with her

24   mother for three or four days.  (AR 769.)  Plaintiff drove, but she had to get out and stretch.  (AR

25   769.)  They went to Cambria where they had breakfast and walked around; Old Town in San

26   Luis where they walked around for approximately 15 to 30 minutes, including going to the

27   Birkenstock shop; Splash Café; Avila Beach for about an hour; The Apple Farm for

28   approximately 15 to 20 minutes; and the Embarcadero at Morro Bay.  (AR 769-70.)

During Plaintiff's second visit with Dr. Robindra in February 2013, Plaintiff said that her mother was staying with her for a month and that they went to Oakland, but she was in pain so they did not do too much, they went to the grocery store, and they went to the park to feed the ducks for a while.  (AR 690.)

Plaintiff's activities of daily living such as interacting with friends, going to the grocery store, going to the park, and going to other places while on vacation are inconsistent with her allegations regarding the severity of her social limitations and not being able to spend any time with others.  An ALJ may properly consider any inconsistencies between a claimant's testimony and conduct.  See Thomas v. Barnhart, 278 F.3d at 958-959.  If the ALJ's interpretation is reasonable and supported by substantial evidence, then it is not the Court's role to second-guess it.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  Therefore, the ALJ did not err when she considered that Plaintiff's daily activities are inconsistent with Plaintiff's claims that she is not able to go out and that she spends no time with others.

3.     The ALJ Properly Discounted Plaintiff's Testimony Based on Plaintiff's Treatment History

Plaintiff argues that the record does not support the ALJ's decision to reject Plaintiff's credibility because of conservative treatment.  Plaintiff asserts that none of her doctors have prescribed water aerobics, physical therapy, or another modality, which were the alternative treatments described by the ALJ that Plaintiff did not pursue.  Plaintiff argues that she should not be faulted for failing to seek alternative treatments for fibromyalgia, where none are recommended and the condition has no cure.  Defendant counters that the ALJ properly found that Plaintiff's treatment history belied her claims regarding the nature and severity of her pain and physical limitations.

The ALJ found:

On May 27, 2011, [Plaintiff] noted that the functional ability of her right arm and the symptoms were gradually improving.  Her treating provider spoke with an elbow specialist, who recommended conservative treatment.  [Plaintiff] was offered a referral to the elbow specialist, but she declined.  Her physician prescribed a tennis elbow strap and continued anti-inflammatory medication and behavioral modification.  She was to return if her symptoms worsened. (Ex. 2F/5, 8)  Thus, [Plaintiff] underwent conservative treatment after her industrial injury,

14

but then actually declined to go see an elbow specialist right at the time of her alleged onset date.

. . .

On December 13, 2011, [Plaintiff] did go to the elbow specialist, Toby Johnson, M.D. now claiming to have no relief….The orthopedist discussed treatment modalities such as Plasma injections and operative management, but [Plaintiff] "elected to continue observation." MRI showed a tearing of the common extensor tendon, with intact ligaments. (Ex. 7F/4-6) Thus, [Plaintiff] declined injection or surgical intervention, despite the extreme reported severity and alleged worsening of her pain. [Plaintiff's] decision tends to indicate that she is not in as much pain as alleged.

. . .

[Plaintiff] subsequently followed with John F. Kirby, M.D. for her worker's compensation treatment for her elbow. She continues to report extreme pain, yet she still has never pursued more definitive treatment with Dr. Johnson, even though Dr. Kirby stated that surgical intervention would not likely worsen her condition and might possibly improve it. Nonetheless, [Plaintiff] just continued pain medications in the setting of this worker's compensation claim.

. . .

In any event, [Plaintiff] did not require any emergency treatment since her alleged onset date despite her dramatically extreme complaints. The only emergency room visit noted was for an abscess, but [Plaintiff] left against medical advice without treatment or examination. (Ex. 12F/9, 14) There really is not evidence that [Plaintiff] has pursued any alternative modalities for fibromyalgia beyond medication, such as water aerobics, physical therapy, or other modality.

(AR 18-19.)

First, the Court notes that the ALJ made multiple statements regarding Plaintiff's treatment history, and not just the one statement challenged by Plaintiff. The ALJ discussed Plaintiff's conservative treatment and instances where Plaintiff failed to seek further treatment.

Second, an "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). As correctly argued by Defendant, the ALJ observed that Plaintiff declined a referral to an elbow specialist in May 2011, and so she was instructed to continue over-the-counter anti-inflammatory medication and behavioral modification and she was given a prescription for a tennis elbow strap. (AR 18, 336.) During Plaintiff's December 13, 2011 appointment with elbow specialist Dr. Toby Johnson, Plaintiff elected to continue observation after Dr. Johnson discussed treatment options such as Plasma, continued therapy, injections, and surgery, although Dr. Johnson did state that the success rates could not be guaranteed. (AR 413.) Dr. John Kirby noted in his March 29, 2012 report that Plaintiff should give serious thought to accepting surgical intervention as it is not likely to worsen her condition, but might possibly improve it. (AR 499.)

1    However, Dr. Kirby also stated that "[Plaintiff] and [he] both agree, however, that additional

2    medical management would be appropriate as indicated in the above plans."  (AR 499.)  The

3    plans were for Plaintiff to take 50 mgs of Indocin three times a day, continue taking six Norco

4    per day, and return next available appointment.  (AR 499.)

5        Third, evidence of conservative treatment is sufficient to discount a claimant's testimony

6    regarding the severity of the impairment.  Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

7    The ALJ noted that Plaintiff underwent conservative treatment after her elbow injury because

8    she was treated with NSAIDs, counterforce brace, physical therapy, and corticosteroid injection.

9    (AR 18, 336.)  Plaintiff just continued with pain medications in the setting of her worker's

10   compensation claim after her appointments with Dr. Kirby.  (AR 19-20, 492-99.)  The ALJ noted

11   that the rheumatologist who saw Plaintiff in July 2011, Dr. Himmat Gill, recommended only

12   conservative care.  (AR 19, 341-42.)  In April 2013, it was noted that Plaintiff was on narcotics

13   for fibromyalgia.  (AR 590.)  At Plaintiff's May 2013 appointment, Dr. Weaver noted that the

14   plan was to continue Plaintiff's current pain medications.  (AR 586-89.)  Further, the ALJ noted

15   that Dr. Rush reported in October 2012 that Plaintiff's fibromyalgia symptoms "may be fairly

16   well controlled with medication."  (AR 22, 507.)

17       Therefore, the Court finds that substantial evidence supports the ALJ's decision to

18   discredit Plaintiff because of her treatment history, which reveals that she received conservative

19   treatment for her severe impairments and failed to seek further treatment.

20       Accordingly, the Court finds that the ALJ provided clear and convincing reasons

21   supported by substantial evidence for discrediting Plaintiff.[3]

22       **B.    The ALJ Did Not Err By Discrediting Ms. Lord's Testimony**

23       Plaintiff also argues that the ALJ erred by discrediting her mother, Ms. Lord's testimony.

24   Defendant counters that the ALJ provided germane reasons for discrediting the third party

25   testimony in this matter.

26   _____

27   [3] While Defendant also argues that the medical opinion evidence is substantial evidence in support of the ALJ's rejection of Plaintiff's complaints of disabling pain, the Court does not address this issue as the Court has already

28   determined that the ALJ provided clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's subjective complaints.

1    "In determining whether a claimant is disabled, an ALJ must consider lay witness

2    testimony concerning a claimant's ability to work." Stout, 454 F.3d at 1053; 20 C.F.R. §

3    404.1513(d)(4).   "Lay witness testimony is competent evidence and cannot be disregarded

4    without comment." Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009) (quoting Nguyen v.

5    Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).   The ALJ must give specific reasons germane to

6    the witness in discounting the lay witness testimony.   Stout, 454 F.3d at 1056; Dodrill v. Shalala,

7    12 F.3d 915, 919 (9th Cir. 1993).   If the ALJ gives reasons for rejecting the claimant's testimony

8    that are equally relevant to similar testimony provided by lay witnesses, that would support a

9    finding that the lay witness testimony is similarly not credible.   Molina, 674 F.3d at 1114.

10    Here, Ms. Lord's testimony in her Third Party Function Reports of Plaintiff's limitations

11    was similar to Plaintiff's own subjective complaints.   (AR 226-33, 253-60, 279-87, 291-99.)

12    The ALJ considered and gave limited weight to Ms. Lord's testimony for three reasons.   (AR 27-

13    28.)

14    First, the ALJ questioned the accuracy of her statements because "she is not medically

15    trained to make exacting observations as to the date, frequencies, types, and degrees of medical

16    signs and symptoms, or the frequency or intensity of unusual moods or mannerisms." (AR 27.)

17    Second, the ALJ considered that she is not "a disinterested witness or party whose statements

18    would not tend to be colored by affection for [Plaintiff] and a natural tendency to agree with the

19    symptoms and limitations [Plaintiff] alleges." (AR 27-28.)   "Friends and family members in a

20    position to observe a [plaintiff's] symptoms and daily activities are competent to testify as to [his

21    or] her condition." Valentine, 574 F.3d at 694 (quoting Dodrill, 12 F.3d at 918-19).   The Ninth

22    Circuit held that "evidence that a specific spouse exaggerated a claimant's symptoms *in order* to

23    get access to his disability benefits," as opposed to being an 'interested party' in the abstract,

24    might suffice to reject that spouse's testimony." Valentine, 574 F.3d at 694 (emphasis in the

25    original).   While an ALJ cannot reject a lay witness's testimony based on abstract reasons, here,

26    the ALJ provided a third reason for giving little weight to Ms. Lord's testimony, which the Court

27    finds is a specific reason germane to Ms. Lord.

28    Third, the ALJ did not give significant weight to Ms. Lord's testimony because it, like

Plaintiff's, is not consistent with the preponderance of the opinions and observations by the medical doctors.  (AR 28.)  As discussed above, the ALJ properly rejected Plaintiff's testimony on the basis that it was not consistent with the medical record, and specifically, the mental evidence in the record.  Therefore, the Court finds that the ALJ gave a specific reason germane to Ms. Lord in giving little weight to Ms. Lord's testimony.  Accordingly, the ALJ did not err in giving little weight to Ms. Lord's testimony.[4]

## V.

## ORDER

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Christin Kay Baer.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **February 13, 2017**

UNITED STATES MAGISTRATE JUDGE

---

[4] To the extent that the ALJ erred by not indicating germane reasons for discounting Ms. Lord's testimony, any such error is harmless.  An ALJ's failure to give specific reasons germane to the witness in rejecting a lay witness's testimony is harmless where that testimony duplicates a plaintiff's testimony, which was already rejected by the ALJ.  See Molina, 674 F.3d at 1122.